USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: 
DATE FILED: 3/14/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------X

E.M. as Parent and Natural
Guardian of N.M., an Infant,

Plaintiff,

-against-

New York City Department
of Education,

Defendant

--------------------------------X

09 Civ. 10623
MEMORANDUM & ORDER

DEBORAH A. BATTS, United States District Judge.

Plaintiff E.M. filed this action against the New York City Department of Education ("DOE") on December 31, 2009, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, et seq., and the New York State Education Law, N.Y. Educ. Law §§ 4401, et seq., seeking reversal of an administrative decision of the State Review Officer ("SRO"), which denied private school tuition funding for Plaintiff's minor daughter, N.M. Both parties now move for summary judgment. For the reasons stated herein, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED.

# I. BACKGROUND

## A. IDEA

The Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., allots federal funds for states that offer a "free and appropriate public education" ("FAPE") to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). The state must establish for each child an Individualized Educational Program ("IEP") that is "reasonably calculated to enable the child to receive educational benefits." Gagliardo v. Arlington Central School Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207, 102 S.Ct. 3034 (1982)). If the school district fails to supply a FAPE, the child's parent may seek tuition reimbursement for the child's placement in a private school. 20 U.S.C. § 1412(a)(10)(C)(ii).

New York receives federal funds under this statute, and charges Committees on Special Education ("CSE"s) with the responsibility of formulating the IEPs. The CSEs are established by local boards of education. N.Y. Educ. L. § 4402(1)(b)(1); 8 N.Y.C.R.R. 200.3(a). Each CSE is comprised of, among other people, the child's parent or guardian, the child's regular education teacher, the child's special education teacher, and a school psychologist. 8 N.Y.C.R.R. 200.3(a)(1). The CSE's

membership also shall include "an additional parent member of a student with a disability residing in the school district or a neighboring school district, provided such parent is not a required member if the parents of the student request that the additional parent member not participate in the meeting...." 8 N.Y.C.R.R. 200.3(a)(1)(viii).

"New York parents who believe an IEP is insufficient under the IDEA may challenge it in an 'impartial due process hearing,' see 20 U.S.C. § 1415(f), before an [Impartial Hearing Officer] appointed by the local board of education, see N.Y. Educ. L. § 4404(1)." Bd. of Educ. v. Mills, No. 03 Civ. 50, 2005 WL 1618765 at *1 (S.D.N.Y. Jul. 11, 2005), quoting Grim v. Rhinebeck Central Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003). "At this hearing and throughout the subsequent administrative and judicial appeals process, the school district bears the burden of proving by a preponderance of the evidence that: (1) it complied with the IDEA procedural requirements; and that (2) the IEP was 'reasonably calculated' to confer 'educational benefits' on the students." J.R. v. Bd. of Educ of the City of Rye Sch. Dist., 345 F.Supp.2d 386, 394 (S.D.N.Y. 2004) (quoting Rowley, 458 U.S. at 206-07). "The Impartial Hearing Officer's decision may be appealed to a [State Review Officer, "SRO"], see N.Y. Educ. L. § 4404(2); 20 U.S.C. § 1415(g), whose decision may

be challenged in either state or federal court." Mills, 2005 WL 1618765 at *1 (citing 20 U.S.C. § 1415(i)(2)(A)).

B. FACTUAL BACKGROUND

Except where noted, the following facts are undisputed. Plaintiff is the mother of N.M., a young girl diagnosed with autism who was born on March 18, 2002. (Pl.'s 56.1 Stmt. ¶¶ 1-3.) N.M.'s autism is severe, and she engages in self-injurious and aggressive behaviors. (Pl.'s 56.1 Stmt. ¶ 4.) A psychoeducational evaluation performed by a DOE psychologist on February 3, 2008 characterized N.M. as "expressing virtually no receptive and expressive language skills . . . extremely active . . . non-verbal, not toilet trained, extremely socially immature youngster who is dependent on others for all daily living skills . . . needs constant supervision in a small regulated class which can also provide for her OT (occupational therapy), PT (physical therapy) and speech and language needs." (Pl.'s 56.1 Stmt. ¶ 6; Def.'s Ex. 1 at 2, 4.) The DOE psychologist was unable to measure N.M.'s cognitive skills due to her lack of language and poor concentration, but estimated that her cognition was in the "deficient range," and that her "communication, daily living skills, socialization, and motor skills were extremely delayed." (Pl.'s 56.1 Stmt. ¶ 8; Def.'s Ex. 1 at 3.) During the 2008-2009 school year, N.M. attended

Reach for the Stars Learning Center ("RFTS"), a private special education school that specializes in the education of autistic students. (Pl.'s 56.1 Stmt. ¶ 5.)

On March 5, 2008, the DOE established a CSE to put together an IEP for N.M. for the 2008-2009 school year. (Pl.'s 56.1 Stmt. ¶ 2; Def.'s 56.1 Stmt ¶ 3.) The CSE team included a school psychologist, a school social worker, a DOE special education teacher, and the Associate Educational Director of RFTS. (Def.'s 56.1 Stmt ¶ 3; Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 3.) The CSE relied on the psychoeducational evaluation conducted on February 3, 2008, as well as materials prepared by N.M.'s teachers and therapists at RFTS. (Pl.'s 56.1 Stmt. ¶ 10.) Based on this information, the CSE determined that N.M. needed the support of a small class with a small number of students and a low student-teacher ratio, with related services. (Def.'s 56.1 Stmt. ¶ 5.) The CSE team recommended a specialized class with a ratio of six students to one teacher to one paraprofessional ("6:1:1") in a twelve month program, with related occupational, physical, and speech therapy sessions. (Def.'s 56.1 Stmt. ¶ 6.) The CSE team considered placement in a private school, but determined that it would be too restrictive. (Id.) The CSE team considered an 8:1:1 program, but determined that it would not meet the student's needs. (Id.)

The annual goals and short-term objectives contained in the March 5, 2008 IEP addressed N.M.'s needs regarding toileting; participation in adapted physical education; self-help skills specific to eating, grooming, and dressing; gross and fine motor skills; receptive and expressive language skills; and ability to process and use sensory information. (Def.'s 56.1 Stmt. ¶ 9.) The CSE developed a behavioral intervention plan ("BIP") that identified N.M.'s tendencies to put pressure on her eyes and demonstrate self-injurious behaviors, and contemplated use of a "token" system to address those behaviors. (Def.'s 56.1 Stmt. ¶ 11; Pl.'s Resp. Def.'s 56.1 Stmt. ¶ 11; Def.'s Ex. 2.)

The class roster of the recommended class included four other students, all classified with autism. (Def.'s 56.1 Stmt. ¶ 20.) One student in the class was verbal, one used a Picture Exchange Communication System, and the other two were building their verbal skills through the use of pictures and low level assistive technology devices. (Id.) Students in the recommended class have exposure to typically developing children. (Def.'s 56.1 Stmt. ¶ 28.) One period each day, eighth grade "helpers" come into the classroom to play and do teacher-designated activities with the students. (Id.) Additionally, students in the recommended class eat lunch with the general population students one day per week. (Id.)

After receiving a Final Notice of Recommendation ("FNR") that N.M. was being offered placement in the 6:1:1 class, Plaintiff claims to have visited the school and the class in question. (Def.'s 56.1 Stmt. ¶ 16.) Although there are discrepancies in testimony regarding when the visit took place, and Ms. Murphy, the teacher in the classroom, does not recall meeting Plaintiff during the time in question (Def.'s 56.1 Stmt. ¶ 16; Tr.[1] at 185), the Impartial Hearing Officer ("IHO") made a factual finding that the visit took place. (IHO Decision at 6.)

Plaintiff unilaterally placed N.M. in RFTS for the 2008-2009 school year. (Pl.'s 56.1 Stmt. ¶ 16.) On June 5, 2008, the DOE received a copy of the FNR with a handwritten notation at the bottom that read: "I visited the recommended placement and did not find it appropriate for [the Student]. I will be reenrolling [the Student] in [RFTS] and will be requesting an impartial hearing for tuition." (Def.'s 56.1 Stmt. ¶ 29.) On August 15, 2008, Plaintiff's counsel notified DOE by letter that Plaintiff was placing N.M. in RFTS for the 2008-2009 school year. (Def.'s 56.1 Stmt. ¶ 31; Pl.'s Ex. M at 1.) The cost for N.M. to attend RFTS during 2008-2009 was $85,000.00 and Plaintiff signed a contract with RFTS obligating her to pay this amount. (Pl.'s 56.1 Stmt. ¶ 21; Pl.'s Exh. E at 1.)

[1] References to "Tr." refer to the Transcript of the Hearing before the Impartial Hearing Officer, held on March 20, March 31, May 12, and May 15, 2009.

Plaintiff requested an impartial hearing on November 26, 2008, alleging that the DOE did not offer N.M. a FAPE and requesting tuition reimbursement for N.M.'s enrollment at RFTS. (Def.'s 56.1 Stmt. ¶ 43.) An impartial hearing was held on March 20, 2009, March 31, 2009, May 12, 2009, and May 15, 2009. (Def.'s 56.1 Stmt. ¶ 44.) On June 3, 2009, The IHO dismissed Plaintiff's claim for tuition reimbursement without addressing the substantive issues regarding whether N.M. had been offered a FAPE. Instead, the IHO found that Plaintiff had not paid RFTS any tuition and that she did not appear to be obligated to do so, and accordingly her claim for reimbursement could not stand. (IHO's Findings of Fact and Decision at 7.)

The IHO further found that since Plaintiff "incurred no financial risk or obligation . . . Reach for the Stars is the real party at interest in this proceeding and the only party to benefit from a decision favorable to" Plaintiff. (Id. at 8.) In consideration of this fact, the IHO looked to the IDEA itself, as well as Supreme Court decisions, and found that the right to "seek recourse" under the IDEA is limited "solely to parties for whom such legislation was intended - the disabled and the parents of the disabled." (Id. at 9.) Therefore, any reimbursement paid directly to RFTS was not allowable as it would "extend the benefits of such legislation to parties unintended." (Id.)

On July 9, 2009, Plaintiff appealed to the State Review Officer of NY State Education Department ("SRO") (Pl.'s 56.1 Stmt. at ¶ 27.) The SRO dismissed Plaintiff's appeal, (SRO Decision No. 09-079 ("SRO Decision") at 1), agreeing with the IHO's finding that Plaintiff lacked standing to claim tuition reimbursement, and that RFTS "lacks standing to maintain a claim against a school district in its own right." (SRO Decision at 12.)

The SRO further found that even if Plaintiff did have standing to bring this claim, the August 15, 2008 letter notifying the DOE that she was placing N.M. in RFTS was inadequate. Based on a First Circuit case, the SRO found that the IDEA's notice requirements in 20 U.S.C. § 1412 were formulated in order to give the district notice prior to a student's removal so that it would have the opportunity to try to provide a FAPE in the public schools by assembling a team and devising a plan. (SRO Decision at 11, n.15) (quoting Greenland Sch. Dist. v. Amy N., 358 F.3d 150, 160 (1st Cir. 2004)).

The SRO also addressed the merits of the case and analyzed whether the DOE offered N.M. a FAPE for the 2008-2009 school year. The SRO found that a FAPE had been offered to N.M., noting that on December 18, 2008, the school district observed N.M. at RFTS and revised the IEP based on this observation as well as on an "assistive technology evaluation" that had been requested by

the speech/language pathologist at RFTS. (SRO Decision at 5, 15.) The SRO found that the evidence showed that the earlier IEP had been formulated so as to provide N.M. with "educational benefits," and that the revision in December 2008 showed the district's responsiveness to the situation. (SRO Decision at 19.) Having found that N.M. had been offered a FAPE, the SRO did not address whether RFTS was an appropriate placement. (SRO Decision at 20.)

Plaintiff now appeals to this Court, seeking reversal of the SRO Decision and summary judgment on her claims that N.M. was denied a FAPE by the DOE for the 2008-2009 school year, that RFTS is an "appropriate placement for N.M. under the IDEA," and that she is not precluded from a tuition reimbursement remedy. (Pl.'s Notice of Motion for Summary Judgment at 2). Defendants cross-move for summary judgment.

## II. Discussion

### A. The Summary Judgment Standard

A district court will grant summary judgment only when there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000). Genuine issues of material fact cannot be created by mere conclusory

allegations; summary judgment is appropriate only when, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." Heublein v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (citing Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)).

In assessing when summary judgment should be granted, "there must be more than a 'scintilla of evidence' in the non-movant's favor; there must be evidence upon which a fact-finder could reasonably find for the non-movant." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). While a court must always "resolv[e] ambiguities and draw [ ] reasonable inferences against the moving party," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson, 477 U.S. at 252), the non-movant may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Id. at 12. Instead, when the moving party has documented particular facts in the record, "the opposing party must 'set forth specific facts showing that there is a genuine issue for trial.'" Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) (quoting Fed. R. Civ. P. 56(e)). Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived "'to put up or shut

up.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).

These same standards apply where, as here, there are cross-motions for summary judgment. Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc., 88 F. Supp. 2d 188, 193 (S.D.N.Y. 2000). A court faced with cross-motions for summary judgment need not "grant judgment as a matter of law for one side or the other," but "'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Heublein, Inc., 996 F.2d at 1461 (quoting Schwabenbauer v. Bd. of Educ. of Olean, 667 F.2d 305, 313-14 (2d Cir. 1981))

B. Judicial Review under IDEA

IDEA actions are generally resolved on summary judgment. See, e.g., S.H. and B.P. ex rel. S.H. v. New York City Dep't of Educ., No. 10 Civ. 1041, 2011 WL 666098 (S.D.N.Y. Feb. 15, 2011); Thies v. New York City Bd. Of Educ., No. 07 Civ. 2000, 2008 WL 344728 (S.D.N.Y. Feb. 4, 2008). A federal court reviewing administrative proceedings under IDEA "shall receive the records of the administrative proceedings"; "shall hear additional evidence at the request of a party"; and "basing its decision on the preponderance of the evidence, shall grant such

relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). When "reviewing an administrative decision under . . . the IDEA, a district court must make a two-step inquiry: first, the court must consider whether the state has complied with the Act's procedural requirements; second, it must consider whether the IEP is "reasonably calculated to enable the child to receive educational benefits." Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2nd Cir. 1997) (quoting Bd. of Educ. Of Hendrick Hudson Central Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206-07 (1982)).

"The Supreme Court and [the Second Circuit] have interpreted the IDEA as strictly limiting judicial review of state administrative decisions." Grim v. Rhinebeck Central Sch. Dist., 346 F.3d 377, 380-81 (2d Cir. 2003), citing Rowley, 458 U.S. at 204-08; Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998). The reviewing federal court "must give 'due weight' to the administrative proceedings, mindful that the judiciary lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Grim, 346 F.3d at 381, quoting Rowley, 458 U.S. at 206-08 (internal quotation marks omitted). "Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful."

Walczak v. Florida Union Free School Dist., 142 F.3d 119, 129 (2d Cir. 1998).

C. Standing

The SRO found that Plaintiff lacked standing to seek reimbursement under IDEA because she has not paid any tuition or incurred any out-of-pocket expenses. (SRO Decision at 11.) Although there is precedent from the Fourth Circuit for the proposition that a person who has not suffered financial loss due to the denial of a FAPE does not have standing to bring suit for retrospective relief under IDEA, see Emery v. Roanoke City Sch. Bd., 432 F.3d 294, 299 (4th Cir. 2005), the only court to have considered the issue within the Second Circuit reached the opposite conclusion. S.W. v. New York City Dep't of Ed., 646 F. Supp. 2d 346, 358-59 (S.D.N.Y. 2009).

This Court agrees with the Court in S.W. that Plaintiff has standing to pursue her claim for direct tuition reimbursement under IDEA. "Congress may create a statutory right the alleged violation of which constitutes injury in fact." Heldman v. Sobol, 962 F.2d 148, 154 (2d Cir. 1992). "The denial of a FAPE or of a procedural right created by IDEA thus constitutes an injury sufficient to satisfy the standing requirement." S.W., 646 F. Supp. 2d at 358.

Furthermore, Plaintiff's injury would be redressed were this Court to award her the relief she seeks. IDEA requires school districts to provide children with disabilities a FAPE, which the statute defines as "special education and related services . . . that have been provided at public expense." 20 U.S.C. § 1401(9). A decision that N.M.'s placement at RFTS was appropriate and that the DOE should be liable for tuition reimbursement would redress the denial of a FAPE for the 2008-2009 school year. See S.W., 646 F. Supp. 2d at 359 (finding that retrospective tuition reimbursement would redress denial of a FAPE for a prior school year where no one had yet paid for that year of education).

D. IDEA

Parents who are dissatisfied with a school district's recommendations for their child for a given school year may place their child in a private school unilaterally and then seek retroactive tuition reimbursement from the local school district. 20 U.S.C. § 1412(a)(10)(C). The Supreme Court in School Comm. Of Burlington v. Dep't of Ed., 471 U.S. 359 (1985), set out a three-step test to determine whether to award private school tuition funding under IDEA. Id. at 370. The DOE is required to pay for a program selected by the parent only if: 1) the IEP proposed by the school district was inappropriate;

2) the private placement was appropriate for the child's needs; and 3) the equities support the parent's claim. Id. at 374.

When reviewing an IEP under IDEA, "a district court must make a two-step inquiry: first, the court must consider whether the state has complied with the Act's procedural requirements; second, it must consider whether the IEP is 'reasonably calculated to enable the child to receive educational benefits.'" Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2nd Cir. 1997) (quoting Board of Ed. v. Rowley, 458 U.S. 176, 207-07 (1982)).

"[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 195 (2d Cir. 2005) (internal quotation marks omitted). School districts are not required to provide "every special service necessary to maximize each handicapped child's potential." Rowley, 458 U.S. at 199. Moreover, there is "a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (internal quotation marks omitted). "Because administrative agencies have special expertise in making judgments concerning

student progress, deference is particularly important when assessing the IEP's substantive adequacy." Cerra, 427 F.3d at 195."

1. Procedural Adequacy of the IEP

Plaintiff first claims that the procedural requirements of IDEA were not met because the DOE did not conduct a Functional Behavior Assessment ("FBA"). 20 U.S.C. 1414(d)(3)(B)(i) requires that, for children whose "behavior impedes the child's learning or that of others," an IEP team must consider strategies and behavior interventions to address the behavior. In such cases, a Behavior Intervention Plan (BIP) is included in the IEP. New York law, however, demands that the CSE consider an FBA "for a student whose behavior impedes his or her learning or that of others, as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities." 8 N.Y.C.R.R. 200.4(b)(1)(v). Plaintiff claims that the IHO and SRO failed to consider the absence of a FBA.

Nevertheless, the absence of an FBA does not render an IEP procedurally inadequate, as long as the IEP itself considers behavioral strategies. See A.C. ex rel M.C. v. Bd. of Educ. of the Chappaqua Sch. Dist., 553 F.3d 165, 172 (2nd Cir. 2009) (finding an IEP that addressed behavior procedurally valid even in the absence of a FBA); J.A. v. East Rampano Cent. Sch. Dist.,

603 F. Supp. 2d 684, 689 (S.D.N.Y. 2009) (rejecting a claim that the absence of a FBA rendered an IEP invalid and finding that IDEA requires only consideration of behavior interventions and strategies).

The BIP included in the IEP in this case considered behavioral interventions and strategies to the extent required by IDEA. The IEP recommends that N.M.'s tantrums and self-injurious behaviors be addressed through the use of a "token system" that would help N.M. to learn to have "quiet hands" and to reduce her tantrums." (Def.'s 56.1 Stmt. at ¶ 11.) Accordingly, the IEP complies with the procedural requirements of IDEA.

2. Substantive Adequacy of the IEP

Plaintiff claims that the IEP was substantively inadequate because the 6:1:1 program was not appropriate, the BIP was insufficient, and the DOE failed to group N.M. with students of similar individual needs.

In this case, testimony was presented to the effect that without one-on-one assistance, N.M.'s self-injurious behaviors will likely increase, (Tr. at 377), that they are currently severe, and that at times it takes several adults just to restrain her. (Tr. at 338-339, 342-43.)

Plaintiff contends that the DOE ignored N.M.'s "core need" of one-on-one attention when developing the IEP. (Pl.'s Reply

Mem. at 17). Plaintiff further points to the DOE's own evaluation that N.M. needs to be "constantly supervised," (Def.'s Ex. 1 at 3-4), and have "highly intensive supervision," (Def.'s Ex. 2 at 4-5). Plaintiff argues that the DOE did not present evidence as to why a 6:1:1 program was enough to keep N.M. safe and meet her educational needs (Pl.'s Mem. Law at 10.) Plaintiff presented the testimony of Ms. Wasserman, an Assistant Director and Associate Educational Director at RFTS, who testified that she told the CSE team that N.M. needed one-on-one attention and that it could sometimes take as many as 3 or 4 people to block her aggressive behaviors (Tr. at 342-43). Ms. Wasserman also testified specifically that she believes 6:1:1 classroom is not appropriate for N.M. because she is only able to stay on task in a group setting for a few minutes and "these behaviors can occur." (Tr. at 345.)

Defendants point out that there was a social worker with four years experience in a private school for autistic children who testified that the CSE felt that all of N.M.'s need would be met in a 6:1:1 placement. The social worker testified that the CSE took into account N.M.'s emotional and social immaturity and the fact that she requires a lot of supervision and has needs such as toilet training. The CSE team concluded that a 6:1:1 program would address these needs adequately. (Tr. at 34-39.)

Further, the decision made by the CSE to place N.M. in a 6:1:1 class was based partially on the DOE psychologist's comment that N.M. "needs constant superivision." (Pl.'s 56.1 Stmt at ¶ 7.)

The SRO decision indicates that the SRO did not, as Plaintiff argues, fail to consider Plaintiff's evidence regarding N.M.'s need for supervision. The SRO considered the February 3, 2008 psychoeducational evaluation, which concluded, as Plaintiff points out, that N.M. "required constant supervision." (SRO Decision at 2.) The SRO also considered the March 5, 2008 CSE meeting, at which Plaintiff's witness participated. (Id.) The SRO also considered evaluations of N.M. conducted by RFTS in June and July of 2008. (SRO Decision at 3.) The SRO considered the December 18, 2008 CSE meeting, at which Plaintiff's witnesses from RFTS again participated. (Id. At 5.) Plaintiff, citing M.H. v. N.Y. City Dep't of Educ., 712 F. Supp. 2d 125, 161 (S.D.N.Y. 2010), argues that because the SRO failed to mention specifically Plaintiff's evidence that N.M. required 1:1 supervision, the SRO decision is unworthy of deference. In M.H., however, the SRO explicitly excluded consideration of Plaintiff's evidence. Id. There is no similar statement in the SRO decision in this case that would allow this Court to conclude that the SRO had failed to consider Plaintiff's evidence. The SRO Decision indicates instead, as noted above, that the SRO did in fact consider such evidence.

Plaintiff also takes issue with the SRO's consideration of the testimony of Ms. Murphy, the teacher in the recommended 6:1:1 class, to support its conclusion that the 6:1:1 placement was appropriate. Plaintiff argues that only the IEP document itself may be considered when determining whether a district has complied substantively with IDEA. (Pl.'s Mem. L. Mot. Summ. J., at 12-13.) This Court notes, as an initial matter, that Plaintiff is unable to identify any cases from within the Second Circuit that stand for the proposition that an SRO may not consider evidence extrinsic to the written IEP. Furthermore, the cases Plaintiff cites all involve admonishments that it is error to consider evidence that a school district could have offered additional programs or services that were not mentioned in the IEP. See, Systema v. Acad. Sch. Dist. No. 20, 538 F.3d 1306, 1315-16 (10th Cir. 2008) (refusing to consider school district's oral offer of additional services); A.K. v. Alexandria City Sch. Bd., 484 F.3d 672, 682 (4th Cir. 2007) (holding that a court could not consider placement offers not included in an IEP); Knable v. Bexley City Sch. Dist., 238 F.3d 755, 768 (6th Cir. 2001) (finding that the district court erred in considering services the school district had the capacity to offer but had not included in an IEP). Ms. Murphy, on the other hand, offered testimony about the nature of the placement actually offered for N.M. in the IEP. It was not error for the

SRO to consider such evidence. The SRO's judgment that the 6:1:1 placement was likely to confer educational benefits is therefore deserving of deference.

Plaintiff next asserts that the SRO did not properly analyze N.M.'s placement in terms of whether she was placed with children of similar abilities. New York Law requires students with disabilities to be placed in similar enough groups that they will not interfere with each others' learning ability. 8 N.Y.C.R.R. 200.6 (a)(3); (Pl.'s Mem. Law. at 17). Plaintiff claims that the children the DOE proposed to place N.M. with had more advanced academic and social skills than N.M. was capable of comporting with. Defendant states that N.M. was placed with students who were classified as students with autism, who were in a similar educational range, and who required "prompting, guidance, and modeling"; only one was verbal. (Def.'s Mem. Law at 34). The SRO considered testimony about the composition of the 6:1:1 class (SRO Decision at 16) and determined that the offered placement was appropriate. This Court will not second-guess the SRO's educational policy determination that the profile of the class was appropriate for N.M.

Finally, Plaintiff avers that the Behavioral Intervention Plan (BIP) was insufficient for N.M.'s needs. While RFTS's BIP included both a token system to reinforce N.M.'s behaviors, as well as physical blocking of her aggressive and self-injurious

actions as necessary, the DOE's BIP, as originally written, included only the token system. (Def.'s Exh. 2 at 18.) Ms. Murphy provided testimony, however, that physical blocking of self-injurious and aggressive behaviors, as well as 1:1 attention where necessary, would have been available in the 6:1:1 placement to address N.M's behavioral concerns. (Def.'s 56.1 Stmt. at ¶ 27; SRO Decision at 18.) Although Plaintiff provides evidence about what would arguably be the best environment for N.M., IDEA does not require "everything that might be thought desirable by loving parents." Walczak, 142 F.3d at 131-32. The BIP recognized that N.M. had behavioral needs and addressed those needs in a specific and concrete way. See Tarlowe v. New York City Bd. Of Educ., 2008 WL 2736027 (S.D.N.Y. July 3, 2008) (finding a BIP adequate where it addressed behavioral concerns with "specific, concrete recommendations").

For each of the challenged portions of the IEP, the SRO evaluated evidence from both sides and made assessments of credibility and appropriate educational policy. The Second Circuit is clear that in such circumstances, a district court may not second-guess the reasoned judgments of an SRO. The district court is not permitted to choose "between the views of conflicting experts on a controversial issue of educational policy ... in direct contradiction of the opinions of state

administrative officers who had heard the same evidence." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 383 (2d Cir. 2003). Here, there is considerable evidence in the record to support the adequacy of the IEP, and it was not unreasonable for the SRO to conclude on the record before it that N.M. was likely to make educational progress under the IEP recommended.

Because this Court finds evidence in the record to support the SRO's decision that N.M. was not denied a FAPE for the 2008-2009 school year, it need not address whether RFTS was an appropriate placement, whether the equities favor tuition reimbursement, or whether direct tuition payment to RFTS is a permissible remedy under IDEA. See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir. 2009).

## III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED. The Clerk of Court is directed to CLOSE the docket in this case.

SO ORDERED.

Dated: New York, New York
March 14, 2011

Deborah A. Batts
Deborah A. Batts
United States District Judge